**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

CAROLYN WINGATE,              *

        Plaintiff,           *

v.                         *        Civil Action No.:  1:07-cv-02923

                         *

JOHNS HOPKINS BAYVIEW
MEDICAL CENTER, INC.       *

        Defendant         *

*     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN OPPOSITION TO**
**SUMMARY JUDGMENT MOTION**

<u>TABLE OF CONTENT</u>

I.      STATEMENT OF THE CASE ……………………………………………… …. 1

II.    STATEMENT OF DISPUTED AND UNDISPUTED FACTS ………………… … 2

III.   ARGUMENTS …………………………………………………………….. 11

     A. Standard of Review ……………………………………………………   11

     B. Defendant is Not Entitle to Summary Judgment on Count I and IV …………… 13

        1. Plaintiff Can Establish By Direct Evidence that Defendant's
          Retaliated Against Plaintiff Because of Racial Animus ……………….…... 13

        2. Plaintiff Can Prove by Inference that Plaintiff's June 28, 2007
          Suspension was in Retaliation for Plaintiff's Protected Activities …………. 14

            a.  Plaintiff Engaged In Protected Activity ……………………………. 15

            b.  Defendant Took Adverse Action Against ……………………………. 17

            c.  Causal connection existed between the Plaintiff's
               Protected activity and asserted adverse action ………………………. 18

   d. Defendant Reasons For the Adverse Actions Against
     the Plaintiff are a Pretext and the Real Reason
     is Because of Plaintiff participation in Protected Activities .......... 19

   e. Impermissible factors actually motivated Defendant
     adverse employment decision taken against Plaintiff ................. 22

   f. Defendant would not have Suspended Plaintiff
     Indefinitely if Plaintiff was not Handing Out
     EEOC Forms while She was Out of Her Work Area ................... 22

C. Defendant is Not Entitled To Summary Judgment on the
  Plaintiff's Disparate Treatment Claim (Count III) .................................... 23

 1. The Plaintiff Can Establish By Direct Evidence that Defendant's
   Discriminatory Treatment of the Plaintiff ....................................... 24

 2. The Plaintiff Can Prove by Inference that Defendant Discriminatory
   Treatment of the Plaintiff was Because of Racial Animus ..................... 24

   a. Plaintiff is a Member of a Protected .................................. 24

   b. Plaintiff's Performed Her Job Consistent With
     the Legitimate Expectation of Defendant ............................ 24

   c. Defendant Took Adverse Actions ..................................... 25

   d. Defendant's June 28, 2007 Suspension of Plaintiff
     Was Done Under Circumstances that Infer
     Discriminatory Motive and Racial Animus .......................... 25

   e. Defendant proffered Legitimate Reason for
     Plaintiff's June 28, 2007 Suspension is a Pretext
     for Racial Animus Against Plaintiff ................................. 26

   f. The real Reason for Defendant suspension of
     Plaintiff was due to racial animus because
     Plaintiff was pressing discrimination claim
     and handing out EEOC forms ........................................ 27

   g. Defendant would not have fired Plaintiff, if
     Plaintiff was not pressing discrimination
     claims and handing out EEOC Forms ................................ 27

IV.  Conclusion .................................................................................. 27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

CAROLYN WINGATE,             *

          Plaintiff,        *

v.                      *      Civil Action No.:  1:07-cv-02923

                      *

JOHNS HOPKINS BAYVIEW
MEDICAL CENTER, INC.      *

          Defendant     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**SUMMARY JUDGMENT MOTION**

The Plaintiff, Carolyn Wingate, ("Plaintiff" or "Ms. Wingate"), by and through her undersigned counsel, respectfully submit this Memorandum of Points and Authorities in Support of Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment.  Because there are substantial and substantive material facts that are disputed by the Parties, and the evidence in the records can established the legal proof of Plaintiff's claims, the Defendant is not entitled to judgment as a matter of law.  This Court should therefore deny Defendant's Motion of Summary Judgment and grant Plaintiff her chance to present her legal proof before a jury.

## I.      STATEMENT OF THE CASE

On October 26, 2007 Plaintiff filed this case seeking relief from this Court against the Defendant because on June 28, 2007 Defendant indefinitely suspended, and effectively terminated, Plaintiff's employment of more than six (6) years because of prohibited discrimination and retaliation, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). On January 17, 2008 and May 2, 2008 Plaintiff filed her First Amended Complaint and a Second Amended Complaint ("Complaint"), respectively. The Complaint pled the legal claims of Retaliation in violation of Title VII, (Count I), Retaliation in violation of Section 1981 (Count II), Disparate Treatment in violation of Title VII (Count III), and Wrongful Discharge (Count IV).

By Order dated April 21, 2008 and July 10, 2008 this Court ruled on, and dismissed several preliminary motions brought by Defendant, including motion to dismiss, motion to strike, and motion to compel joinder and motion in opposition to Plaintiff's motion for leave to amend. The Court's July 10, 2008 Order also dismissed Count IV from the Complaint. Defendant then Answered Plaintiff's Complaint on July 24 2008.

The Parties have completed discovery and the Defendant now brings this dispositive motion for summary judgment, claiming that there are no material facts in dispute to be put before a jury, and that the Defendant is entitled to judgment as a matter of law. Defendant's dispositive motion again request this Court to dismiss the Plaintiff's entire case on summary judgment. Plaintiff now submit this opposition to Defendant's dispositive motion on the grounds stated herein.

## II. STATEMENT OF DISPUTED AND UNDISPUTED FACTS

Plaintiff is an African American woman who was employed by Defendant on December 4, 2000. Plaintiff was hired as a house keeping aide in the Defendant's environmental services department. *(Deposition of Carolyn Wingate Volume I, attached hereto as Exhibit 1 at 13-14) (Carolyn Wingate 11/24/00 Employment Letter, attached hereto as Exhibit 2)* The vast majority of Plaintiff's co-workers in

the environmental services department were African Americans. (Exhibit 1 at 113, 132), *(Affidavit of Magdalene Burrell, attached hereto as Exhibit 3 ¶ 3)*,

Throughout her years of employment, Plaintiff was a good worker and performer. Portions of Plaintiff December 24, 2002 Annual Evaluation noted the following:

> "<u>Overall Evaluation</u>: *Good worker – goes the extra mile – help in other areas;* <u>Developmental Goals:</u> *Needs retraining in High & Low dusting – Needs to stay in her area*".

*(Wingate 12/24/02 Annual Evaluation, attached hereto as Exhibit 4)* Plaintiff's December 3, 2003 "Criteria-Based Performance Appraisal noted the following:

> "<u>Overall Evaluation</u>: *Ms Wingate has been a very conscientious employee who is always will to assist others when needed. When asked by management, Ms. Wingate is very willing to pitch in where needed she is a team player. Ms. Wingate has requested at times as to when she can obtain her own assigned area. Her supervisor will continue to evaluate her performance and prepare her for future openings that may develop on day shift. In the meantime Ms. Wingate must continue to maintain her current level of performance to qualify and as a relief to become very familiar with all the areas on day shift in preparation for a possible permanent assigned area."* <u>Developmental Goals</u>: *1. Ms. Wingate will obtain all necessary supplies and equipment before going to her assigned area thereby minimizing the need for Ms. Wingate to leave her assigned work area. If a need develops, Ms. Wingate must advise management that she is leaving her assigned area."*

*(Wingate 12/03/03 Criteria-Based Performance Appraisal, hereto as Exhibit 5)* Plaintiff's December 4, 2004 Follow-up Annual Evaluation indicates:

> <u>Overall Evaluation</u>: *"Ms. Wingate is a dependable employee, normally gives assistance throughout the facility in all areas.* <u>Developmental Goals</u>: *Ms. Wingate needs to stay within her assigned work area."*

*(Wingate 12/04/04 Follow-up Annual Evaluation attached hereto as Exhibit 6)* There was no "overall evaluation" or "developmental goal" noted on Plaintiff's December 2005 evaluation which was signed

3

in 2006.[1] Plaintiff had an overall score of 162 out of a maximum score of 200. *(Wingate's 12/04/05 Annual Evaluation, attached hereto as Exhibit 7)* However, Plaintiff's approved November 27, 2006 and May 8, 2007 tuition reimbursement request forms shows that Plaintiff had no disciplinary action against Plaintiff in the twelve (12) months prior to those dates. *(Wingate's Approved Tuition Reimbursement Request Forms, attached here to as Exhibit 8)* *(Wingate 01/07/08 NLRB Affidavit, attached hereto as Exhibit 9 at 2) (Wingate Deposition Volume II, attached hereto as Exhibit 10 at 158-187)*

Throughout her employment, Plaintiff and other African American employees in Defendant's food and environmental services department (herein after "Co-workers") believed that Defendant had been treating them in an unfair and discriminatory manner, as oppose to how Defendant's treated Defendant employees in other departments and areas of the Defendant's organization, where the employees are of mixed races, and or predominantly of the white race. *(Exhibit 10 at 188-205) (Exhibit 3 ¶ 4), (Exhibit 9 at 2) (Exhibit 1 at 101-117) (Wingate EEOC Intake Questionnaire, attached hereto as Exhibit 11)* Plaintiff and her Co-workers believed that Defendant was denying them promotions and work breaks, and using them unfairly to perform nursing cleanup work, . *(Exhibit 1 at 101-117) (Exhibit 9 at 2-3)* They felt, unfairly treated, disregarded, overworked, underpaid, "oppressed", and that they were looked down upon and mistreated by other "departments". *(Exhibit 9 at 5-6) (Wingate & Co-Workers Petition, attached hereto as Exhibit 12)* Plaintiff and her Co-workers believed that Defendant discriminated against them and treated them unfairly because they were African Americans, and Plaintiff and her co-workers were at the lowest tier of the Defendant's organization as housekeeping and

---

[1]   This evaluation was done by phone conference with Plaintiff. *(Exhibit 7)*

kitchen staff. *(Exhibit 1 at 132) (Exhibit 3 ¶ 4)* Plaintiff and her Co-workers also felt that they wanted to change their collective bargaining unit, the American Federation of State, County and Municipal employees, AFSCME Council 67, Local 3374, AFL-CIO (hereinafter "Local 3374"). Plaintiff and her Co-workers believed that Local 3374, was not addressing their unfair treatment and discrimination issues and was not working in their best interest. *(Wingate's 07/02/07 letter to Local 3374, attached hereto as Exhibit 13)*

On or about May 4, 2007 Plaintiff complained to Defendant's human resource office about an incident involving Plaintiff and a co-worker in which Plaintiff felt that a group of white employees harassed, ridiculed, and belittled Plaintiff.[2] *(Exhibit 9 at 3) (Exhibit 10 at 201) (Exhibit 11)* Plaintiff reported the incident to Ms. Jesse Kohajda[3] in Defendant's human resource office, but was told to "just suck it up", and to go through her "chain of command". *(Exhibit 1 at 116-119) (Exhibit 9 at 6)* That same day Plaintiff also called Mr. Archie Blackwell, an agent of Local 3374, and lodged a grievance about the incident. *(Exhibit 9 at 6-7) (Exhibit 10 at 206-207)* Subsequently, Plaintiff made repeated attempts to have her complaint about the incident heard, before on or about May 22, 2007 when Plaintiff met with Mr. Robert Gair, the director of Defendant's environmental service department. *(Exhibit 1 at 124) (Exhibit 9 at 7) (Exhibit 10 at 209-211)* However, Mr. Gair was dismissive of Plaintiff's complaint and chided Plaintiff for reporting the incident. *(Exhibit 1 at 120-123) (Exhibit 9 at 7) (Exhibit 10 at 211)* At about the same time, Plaintiff followed up with the grievance she had lodged with Local 3374

---

[2]    Plaintiff was required to clean a small spot on a floor three times, after her co-worker had clean the said spot about three times. After each time that the spot was cleaned, a group of white nurses smirched on the spot, stating that it was not clean and demanding that it be cleaned again. While they were doing this they were mocking and laughing at Plaintiff, and making remarks that Plaintiff and her co-workers could not read. They also threatened to have Plaintiff written up. **(Cite)**

[3]    Plaintiff has previously identified this witness in the records of the case, as Jessica Powell or Jessie Powell. However, Plaintiff and Defendant agree that this is the said individual Jesse Kohajda.

about the incident, and met with Local 3374 shop steward Mr. Joseph Shafferbein[4], about the incident and other complaints of unfair treatment against Plaintiff and her Co-workers. *(Exhibit 1 at 125-127) (Exhibit 9 at 7-8)* During the meeting, Mr. Shafferbein told Plaintiff to write up a petition of the complaints and grievances of Plaintiff and her Co-workers and collect the signatures of Plaintiff Co-workers who supported the petition (herein after "Petition"). *(Exhibit 9 at 8) (Exhibit 10 at 212-213) (Wingate 02/21/08 NLRB Affidavit, attached hereto as Exhibit 14) (Exhibit 13),* Defendant admitted that Plaintiff did complain to Mr. Shafferbein and that Mr. Shafferbein gave Plaintiff directives to prepare the Petition and get supporting signatures. *(Wingate's Unemployment Benefit Determination Appeal Hearing Transcript, attached hereto as Exhibit 15 at 28, 34)* Defendant also admitted that it would be the responsibility of Local 3374 to notify management about the Plaintiff's directed activities to pursue the Petition. *(Id. at 35)* Plaintiff believed that she had proper authority from Mr. Shafferbein to carry out the Petition activities. *(Exhibit 10 at 213)*

On or about June 14, 2007 Plaintiff typed up the Petition of issues and grievances that Plaintiff and her Co-workers wanted addressed by Defendant, and immediately started collecting signatures from her Co-workers who supported the Petition. *(Exhibit 1 at 129-132) (Exhibit 9 at 8) (Exhibit 14)* Additionally, Plaintiff visited the Equal Employment Opportunity Commission ("EEOC") office in Baltimore, and complained about the unfair and discriminatory treatment against Plaintiff and her Co-workers. *(Exhibit 9 at 8) (Exhibit 1 at 134)* Personnel at the EEOC intake office told Plaintiff she could make copies of the EEOC intake form, and pass on to her Co-workers who had complaints of

---

[4]     Plaintiff has previously Identified this witness in the records of this matter as Joey Shaffer.  However, Plaintiff and Defendant agree that this is the said witness Shafferbein.

discrimination. *(Exhibit 9 at 8-9), Exhibit 1 at 134-136) (Exhibit 15 at -)* Also, on June 14, 2007 Plaintiff was accused by a nurse of taking food that was not given to Plaintiff, and Plaintiff was given a disciplinary write up on June 16, 2007, for the June 14, 2007 allegations about taking food.[5] *(Exhibit 10 at 220-227) (Debbie Napier Email to Harry Mathews, attached hereto as Exhibit 17) (Wingate's 6/16/07 Employee Disciplinary Record, attached hereto as Exhibit 18)* Plaintiff was on her lunch break during the time when the alleged incident took place. *(Exhibit 15 at 15-19)* The allegation was never investigated by Defendant. *(Oberender Deposition Transcript, attached hereto as Exhibit 16 at 65-66)* However, by this time Plaintiff supervisors, including Mr. Gair knew that Plaintiff had started the Petition and was collecting signatures. *(Defendant's Answer to Interrogatories, attached hereto as Exhibit 27, Ans. Intrr. #22 at 20-21)*

By June 21, 2007 Plaintiff had collected no less than seventy two (72) signatures of her Co-workers who supported the petition. *(Exhibit 1 at 134) (Exhibit 12)* Plaintiff turned over the original Petition with the original signatures to Mr. Shafferbein, and a copy to Mr. Gair. *(Exhibit 10 at 215-217, 228-229) (Exhibit 16 at 50)* All the signatures were collected by Plaintiff from her Co-workers who voluntarily supported the Petition. Plaintiff collected some of the signatures while she was on lunch break and some during the course of her work when she came in contact with her co-workers. *(Exhibit 9 at 8) (Exhibit 10 at 230-235) (Exhibit 14)* Plaintiff did not neglect any duties as she carried out the Petition activities. *(Ex 16 at 67)*

---

[5] On February 14, 2007 Plaintiff work in the Emergency Room area. During her lunch break she helps herself to some food treats that a vendor to the hospital had left for the employees in the ER. Other employees had started taking some of the treats as well. Defendant has no policy regarding vendor donated treats for Defendant Employees, and Plaintiff was not out of her assigned area at the time of the incident. *(Exhibit 10 at 223) (Oberender Deposition Transcript, attached hereto as Exhibit 16 at 66)*

During the week starting June 26, 2007 Plaintiff took the EEOC forms to work and passed out around twenty of the forms to her Co-workers who had signed the Petition and requested the EEOC form. *(Exhibit 9 at 8-9)* On June 28, 2007, Plaintiff reported to work at 6: 30 a.m., and was assigned to work in the "B-Building". Plaintiff was assigned to, and responsible for, the 2nd, 4th and 5th Floors. *(Exhibit 1 at 145) (Exhibit 10 at 230)* At around 10:00 a.m., during the course of her work, Plaintiff stop by one of her Co-workers in the B-Building who had asked Plaintiff for one of the EEOC forms. *(Exhibit 10 at 234-235)* As Plaintiff handed the EEOC complaint form to her Co-worker, they were approached By Plaintiff's supervisors Mr. Harry Mathews and Mr. Ronald Hart. *(Exhibit 10 at 236)* Mr. Mathews questioned the Co-worker about the EEOC form and requested to see the form. After Mr. Mathews review the form, he and Mr. Hart walked away without saying anything to Plaintiff or her co-worker. *(Exhibit 9 at 9)* Mr. Mathews and or Mr. Hart reported Plaintiff's activity to Mr. Gair who was expressly concerned and apparently upset because Plaintiff was handing out the EEOC forms. *(Exhibit 10 at 236-239)* Mr. Gair was ok with Plaintiff's Petition activities until he became aware that Plaintiff was passing out of the EEOC forms. *(Exhibit 15 at 16-17)* Later that day, at about 2:00 p.m., Mr. Gair escorted Plaintiff to Defendant's HR office where Plaintiff met with Mr. Gair and Ms. Kohajda. *(Exhibit 15 at 18) (Exhibit 9 at 11) (Exhibit 10 at 245)* In contravention of Defendant's own employee policies and procedures, Defendant immediately suspended Plaintiff from her employment, without pay, and paraded Plaintiff off Defendant premises with security personnel.[6] *(Exhibit 9 at 110) (Exhibit 10 at 246-251) (JHBMC Discharge and Discipline Policy attached hereto as Exhibit 19) (Wingate 6/28/07*

---

[6] Defendant Discharge and Disciplinary policy and procedures sets forth a suspension process that Defendant ignored.

*Employee Disciplinary Record attached hereto as Exhibit 20) (Wingate 6/28/09 Suspension Letter attached hereto as Exhibit 21)* Defendant stated that Plaintiff was suspended, until further notice or pending an investigation, because Plaintiff was out of Plaintiff's assigned work area. *(Id.) (Exhibit 15 at 7, 16)* Defendant later admitted that Plaintiff was suspended for handing out the EEOC forms, and been out of her work area. *(Exhibit 16 at 35-36) (Exhibit 27 - Ans. Intrr. #22 at 20-21) (Exhibit 15 at 7)* Mr. Gair stated that Plaintiff: *"was handing out EEOC petitions and I was concerned about that",* and further: *"It had nothing to do with the petition at this point in time. She was out of her area. She had an EEOC form that she was handing out to be filled out and returned to her." (Exhibit 15 at 16-17).*

Plaintiff immediately protested the action of Defendant as retaliatory and discriminatory. *(Exhibit 10 at 252-255) (Wingate 6/28/07 Suspension Protest Statement, attached hereto as Exhibit 22)* The following day, June 29 2007, Plaintiff visited the EEOC's office in Baltimore and filed charges of race discrimination and retaliation against Defendant. *(Exhibit 10 at 188) (Exhibit 11)* On July 3, 2007, Plaintiff talked to Ms. Evelyn Oberender, Defendant's director of employee and labor relations. Ms. Oberender said she was in a meeting with Mr. Blackwell and Mr. Gair to decide what to do about Plaintiff. Ms. Oberender took a brief statement from Plaintiff over the phone and told Plaintiff that Defendant would get back in touch with Plaintiff. *(Exhibit 10 at 257-260) (Exhibit 9 at 12)*

Subsequently Plaintiff called at least twice and left messages for Ms. Oberender regarding the status of Plaintiff's job. After two weeks out of work, and nearly two weeks without getting any response from Defendant regarding the status of her employment, on July 12, 2007, Plaintiff felt forced to write and later submit a letter of resignation that Defendant received on July 18, 2007. *(Exhibit 10*

*at 265-269) (Wingate 07/12/07 Resignation Letter, attached hereto as Exhibit 23)* Defendant allegedly had still not yet completed its investigation or decided on the employment status of Plaintiff on July 18, 2007. *(Exhibit 16 at 37)* However, Defendant did not do any formal investigation into Plaintiff and her Co-workers discrimination claims and grievances that led to Plaintiff's suspension. *(Exhibit 16 at 17-20)* Defendant supported and accepted the decision of Mr. Gair as Justified. (*Exhibit 27, Ans. Intrr. 16 at 13-14*) Despite the severe devastating effects of Defendant's actions, Plaintiff's resignation letter expressed optimism maintained a sense of dignity and self respect in the face of the adversity. However, Plaintiff had not planned to leave Defendant's employment, and was actively seeking to advance in other areas of employment within the Defendant's organization. *(Exhibit 10 at 265-271)*

Plaintiff was shocked and emotionally devastated by the drastic actions of Defendant. Plaintiff's livelihood was suddenly cut off, and as a single mother with two children, Plaintiff's family was in crisis. *(Exhibit 10 at 264)* Plaintiff busily searched for any kind of employment she could get to take care of her family. *(Exhibit 10 at 270-276) (Wingate America Works Job Search List, attached hereto as Exhibit 24)* Defendant came after Plaintiff aggressively, repossessing her car, demanding closure of her credit union account, demanding payment of her tuition reimbursement and successfully blocking her unemployment insurance benefit application. *(Exhibit 10 at 278-283) (JHBMC 08/07/07 Tuition Reimbursement Letter to Wingate, attached hereto as Exhibit 25)* Because of the actions Defendant took against Plaintiff, the Co-workers became fearful and intimidated, and abandoned Plaintiff. *(Exhibit 3 ¶ 8) (Exhibit 10 at 276-7)* Defendant never investigated Plaintiff's May 4, 2007 complaint, the June 28, 2007 suspension, or Plaintiff and her Co-workers belief that they were been

treated unfairly because of their race as African Americans. *(Exhibit 16 at 37, 50-52)* However, Defendant reached a secret deal and settlement with Local 3374 in exchange for Plaintiff's job and suppression of the Co-workers race discrimination claims.

Plaintiff has personal knowledge that other Defendant employees, including Plaintiff's supervisor (Mr. Hart?) leave their assigned work areas and carryout solicitation activities, unrelated to work, including selling Avon products, CDs, DVDs, clothing and other items, with the knowledge of Defendant. The Defendant did not take any adverse actions against these employees for these activities. *(Exhibit 9 at 14-15) (Exhibit 3 ¶ 7)*

## III.   ARGUMENTS

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE MATERIAL FACTS, AND THE REASONABLE INFERENCES THAT CAN BE DRAWN FROM THE MATERIAL FACTS, ARE IN DISPUTE.  ALSO, THE RECORDS IN THE CASE CONTAIN SUFFICIENT LEGAL PROOFS FOR PLAINTIFF TO ESTABLISH PLAINTIFF'S DISCRIMINATION CLAIMS.**

### A.   Summary Judgment Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.   As the parties moving for summary judgment, the Defendant has both an initial burden of production, and the ultimate burden of persuading the court that there is "no genuine issue of material fact and that the moving party is entitled to summary judgment." *Fed. R. Civ. P. 56(c).* When the moving party has met their initial burden of production, the opposing party must only present evidence sufficient to create a genuine issue of material fact, i.e., that a "fair-minded jury could return a verdict for the [opposing party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 247 (1986).  Inferences drawn from

the evidence must be viewed in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 456 (1992). Credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether his ruling is on motion for summary judgment or for directed verdict; evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*... In employment discrimination case, where employer's state of mind necessarily is critical determination, court must find that it is "perfectly clear" that there are no genuine issues of material fact before granting summary judgment. *Featherson v. Montgomery County Public Schools*, 739 F. Supp 1025 (D. Md. 1990).

Summary judgment is only proper if there is no dispute as to any material fact or as to the reasonable inferences that can be drawn from the facts. Where the party challenging the grant of summary judgment can show that the inferences they suggest are reasonable in light of the competing inferences, summary judgment must be denied. *Columbia Union College v. Clarke,* 159 F. 3d 164 (D.Md. 1998). Summary judgment is inappropriate even if merely inferences to be drawn from facts are in dispute. *U.S. ex rel. Milam v. Regents of University of California,* 912 F. Supp. 874 (D.Md. 1995). Summary judgment should be granted only when it is clear that there is no dispute concerning either facts of the controversy or inferences to be drawn from those facts. *Neufeld v. City of Baltimore,* 863 F.Supp 255 (D.Md.1994)

"Pursuant to the 1991 amendments to the Civil Rights Act, for a Title VII plaintiff to avert summary judgment, the impermissible factor motivating the employer's adverse employment decision need not have been the sole factor; as long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice." *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 317 (S.C. 2005)

**B. Defendant is Not Entitled To Summary Judgment on the Plaintiff's Retaliation Claims pursuant to Title VII and Section 1981.**

 **1. Plaintiff Can Establish By Direct Evidence that Defendant's Retaliated Against Plaintiff Because of Racial Animus**

The US Supreme Court has held that "If an employment discrimination plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case under *McDonnell Douglas* standard. *Swierkiewicz v. Sorema, N.A.,* 534 US 511(2002). See also, *Hylind v. Xerox Corp.,* 380 F. Supp. 2d 710, (D.Md. 2005). Under this Court's persuasive authority, direct evidence "describes a relationship between proof and incidents and is not a characterization of the proof itself, but is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wagner v. Dillard Department Stores, In*c. 2001 WL 967495 (4th Cir. 2001).

On June 28, 2009 Plaintiff was summarily suspended from her job and source of livelihood because she was handing out EEOC forms to Co-workers and pressing her claim of unfair treatment and race discrimination for herself and her Co-workers. With regards to Plaintiff's suspension Mr. Gair said Plaintiff: *"was handing out EEOC petitions and I was concerned about that",* and further: *"It had nothing to do with the petition at this point in time. She was out of her area. She had an EEOC form that she was handing out to be filled out and returned to her." (Exhibit 15 at 16-17)* Defendant further admitted that Plaintiff was suspended for handing out the EEOC forms. *(Exhibit 16 at 35) (Exhibit 27 Ans. Intrr. 22 at 20-21)*

 Defendant's actions against Plaintiff have served to cower and silence the 72 Co-workers who

signed the petition, and other African American employees, on any real or perceived race base issues or grievances affecting the term, benefits and conditions of their employment. *(Exhibit 3 ¶ 7)*

The facts and inferences for Defendant's actions and statements "is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions", to suspend Plaintiff on June 28, 2007 and effectively terminated Plaintiff's employment.

### 2. Plaintiff Can Prove by Inference that Plaintiff's June 28, 2007 Suspension was in Retaliation for Plaintiff's Protected Activities

Where direct or indirect evidence is lacking, the employee may utilize the McDonnell Douglas framework to offer circumstantial evidence of retaliation. Under McDonnell Douglas, the employee must first establish a prima facie case of retaliation, at which point the burden shifts to the employer to establish a legitimate non-retaliatory reason for its action. If the employer sets forth a legitimate non-retaliatory explanation, the employee must then show that the employer's proffered reasons are pretextual, otherwise her claim will fail. Prima facie case of retaliation under Title VII requires a showing that (1) that employee engaged in a protected activity, (2) that her employer took an employment action against her that a reasonable employee would have found materially adverse, and (3) that there was a causal connection between the protected activity and the adverse employment action. See, *Hylind at* 710, (D.Md. 2005), *Kline v. Certainteed Corp.,* 205 F. Supp. 2d 474 (D.Md. 2002).*McGrath-Malott v. Maryland*, 565 F. Supp. 2d 664, (D.Md. 2008), and Reed *v. Airtran Airways*, 531 F. Supp. 2d 670, (D.Md. 2008).

There is direct and indirect evidence in the records of the case for the legal proof that Defendant's June 28, 2007 suspension of Plaintiff was in violation of Title VII and Section 1981.

However, Plaintiff can also prove Defendant's violations of Title VII and Section 1981 by inference.

### a. Plaintiff Engaged In Protected Activity

To be *"protected activity"* that will support Title VII retaliation claim, employee must have had an objectively reasonable belief that she was complaining about conduct that constituted a Title VII violation. *Reed v. Airtran Airways*, 531 F. Supp. 2d 671, (D.Md. 2008).

"In context of a Title VII retaliation claim, a "protected activity" may fall into two categories, opposition and participation; protected oppositional activities may include staging informal protests and voicing one's own opinions in order to bring attention to employer's discriminatory activities, as well as complaints about suspected violations. Title VII retaliation provision protects activity in opposition not only to employment actions that are actually unlawful under Title VII, but also employment actions that employee reasonably believes to be unlawful. *E.E.O.C. v. Navy Federal Credit Union*, 424 F. 3d 406 (VA. 2005)

Plaintiff first engaged in protected activity when she reported the May 4, 2007 incident to Jessie Khadah at the Defendant human resource office. All of Plaintiff's subsequent actions in dealing with this incident, including complaining to Mr. Gair, complaining to Mr. Shaffer, following through with Mr. Shafferbein's directive to collect employees' signatures, complaining to the EEOC on June 14, 2007, and handing out of the EEOC forms are all protected activity. *(Exhibit 1 at 129-132) (Exhibit 9 at 8) (Exhibit 14) (Exhibit 1 at 134)* Before this, Plaintiff and her Co-workers had been complaining to Defendant about what Plaintiff and her Co-Worker believed to be unfair treatment that was in part motivated by racial animus. *(Exhibit 10 at 188-205) (Exhibit 3 ¶ 4), (Exhibit 9 at 2-3) (Exhibit 1 at 101-*

*117)* However, Plaintiff was propelled into action after the May 4, 2007 incident that Plaintiff believed was racially motivated. From then on Plaintiff started openly and actively opposes the treatment of Defendant as discriminatory. The way Defendant treated Plaintiff's complaint about the May 4, 2007 incident would reinforce in Plaintiff's mind, and any reasonable person similarly situated as the Plaintiff, the belief that race was a motivating factor in the way Plaintiff was treated. Defendant brushed off Plaintiff's complaint and told her to "suck it up", and never investigated Plaintiff's allegations. *(Exhibit 1 at 116-119) (Exhibit 9 at 6)* Prior to this there were ongoing issues involving complaint of discrimination and unfair treatment by a substantial majority of Plaintiff's Co-workers.

Plaintiff's Petition activities extended to the handing out of the EEOC forms, as Plaintiff and her Co-workers had objective basis to reasonably believe that Defendant was treating them in a discriminatory manner. On June 14 2007, the same day Plaintiff drafted the petition and started collecting signatures, Plaintiff visited the EEOC office and complaint about the issues she and her Co-workers believed constituted unfair and discriminatory treatment. *(Exhibit 9 at 8) (Exhibit 1 at 134)* After collecting about 72 signatures on the Petition, Plaintiff gave the Petition to Defendant and Local 3374 on or about June 21, 2007. A week later, and without any response from Defendant or Local 3374, Plaintiff started handing out copies of EEOC intake forms to her Co-workers.

From these facts it is clear that Plaintiff and her Co-worker had the subjective belief, objectively supported, that Defendant actions were unlawful and in violation of Title VII, and further that Plaintiff and her Co-workers were properly opposing such actions, and or taking steps to address such actions.

### b. Defendant Took Adverse Action Against the Plaintiff:

"In defining what constitutes an adverse employment action for purposes of § 1981, which guarantees equal contract rights regardless of race, the District Court looks to whether discrimination existed in an ultimate employment decision such as hiring, granting leave, discharging, promoting, and compensating." *Pulley v. KPMG Consulting, Inc*., 348 F. Supp. 2d 395 (D.Md. 2004) Additionally, "a suspension from pay and duty clearly amounts to an actionable employment action; just as clearly, a proposed suspension that is never carried out does not." *Jeffers v. Thompson*, 264 F. Supp. 2d 330 (D.Md. 2003) Defendant's June 28, 2007 immediate indefinite suspension of Plaintiff constituted adverse action. The suspension was indefinite and without pay, and constituted an ultimate employment decision in terms of its detrimental effect on Plaintiff's employment.

Furthermore Defendant's June 28, 2007 indefinite suspension of Plaintiff without pay constituted constructive discharge. "To advance a claim for constructive discharge, a Title VII plaintiff must show that the employer deliberately made her working conditions intolerable and thereby forced her to quit her job." *Venugopal v. Shire Laboratories*, 334 F. Supp. 2d 846 (D.Md. 2004) The June 28, 2007 summary suspension of Plaintiff eliminated Plaintiff work, and created an intolerable working condition of no work and no pay for Plaintiff. On July 12, 2007 when Plaintiff penned her resignation letter, it had been two weeks since her suspension and she had not heard back from Defendant since July 3, 2007. Plaintiff call Defendant at least twice after July 3, 2007 before July 12, 2007, and Defendant did not return the calls. Furthermore by July 18, 2007, three weeks after Plaintiff's suspension, Defendant had not yet decided on Plaintiff's employment status, or completed an investigation of which Defendant had all of the facts. *(Exhibit 16 at 17-20)*

The indefinite suspension of Plaintiff was unwarranted and deliberately made and designed with the intention to starve Plaintiff into quitting her employment, which it achieved. The suspension of Plaintiff brought about a significant change in her employment status and has inflicted severe direct economic harm and emotional pain and suffering for the Plaintiff. Although Plaintiff remained optimistic, appreciative and gracious in her resignation letter, her life and her family was economically and emotionally devastated by the actions of the Defendant.

### c. Causal connection existed between the Plaintiff's Protected activity and asserted adverse action.

"For purposes of demonstrating prima facie case of retaliation, causal connection exists where employer takes adverse employment action against employee shortly after learning of protected activity; passage of time generally tends to negate inference of discrimination." *Price v. Thompson*, 380 F. 3d 213 (D.Md. 2004)

Causal connection exists between Defendant's June 28, 2007 indefinite suspension of the Plaintiff and the Plaintiff's protected activities. Mr. Gair stated that Plaintiff: *"was handing out EEOC petitions and I was concerned about that",* and further: *"It had nothing to do with the petition at this point in time. She was out of her area. She had an EEOC form that she was handing out to be filled out and returned to her." (Exhibit 15 at 16-17).* Defendant had also admitted that in the records that Plaintiff handing out of the EEOC forms was a motivating reason for Plaintiff's suspension. *(Exhibit 16 at 35-36)* By Defendant's own admission, casual connection between Plaintiff's protected activities and her June 28, 2007 indefinite suspension. Immediately upon learning that Plaintiff was handing out EEOC forms and pursuing claims of race discrimination Defendant acted to suspend Plaintiff for her

18

employment.

### d. Defendant Reasons For the Adverse Actions Against the Plaintiff are a Pretext and the Real Reason is Because of Plaintiff participation in Protected Activities.

Defendant's reason that Plaintiff was suspended for been out of her work area is a pretext and the real reason was because Plaintiff was pursuing race discrimination claims for herself, and Co-workers, and handing out the EEOC Forms to her Co-workers. "Employment discrimination plaintiff may establish pretext by proving that employer's explanation for employment decision is unworthy of credence or that employer's explanation is false; in appropriate circumstances, trier of fact can reasonably infer from falsity of explanation that employer is dissembling to cover up discriminatory purpose." *Anderson v. Westinghouse Savannah River Co.,* 406 F. 3d 269 (S.C. 2005)

Defendant performance evaluations of Plaintiff over the years show that Plaintiff was a:

> *"Good worker – goes the extra mile – help in other areas" "a very conscientious employee who is always will to assist others when needed. When asked by management, Ms. Wingate is very willing to pitch in where needed she is a team player." "a dependable employee, normally gives assistance throughout the facility in all areas."*

Furthermore, Plaintiff was a floater or "relief" housekeeping staff, who since 2003 "*has requested at times as to when she can obtain her own assigned area.*" At that time it was mandated that Plaintiff: "*must continue to maintain her current level of performance to qualify and as a relief to become very familiar with all the areas on day shift in preparation for a possible permanent assigned area.*" Plaintiff's performance evaluations also show that over the years of her employment Defendant have repeatedly identified a "developmental goal" for Plaintiff: "*to stay within her assigned work area*".

*(Exhibit 4) (Exhibit 5) (Exhibit 6)* However, up to May 8, 2007, Plaintiff approved "Tuition Reimbursement Request" from shows that Plaintiff "has not had any formal disciplinary actions within the previous twelve (12) months." *(Exhibit 8)*

Clearly the way Defendant schedule and use plaintiff in the role of a floater or relief housekeeper, without a permanent assigned work area, who assisted others throughout all areas of Defendant facility, contributed to Plaintiff having difficulties staying within an assigned work area. Furthermore, since 2003 Plaintiff was required "*as a relief to become very familiar with all the areas on day shift in preparation for a possible permanent assigned area.*" Since then Defendant's goal for Plaintiff was to "*continue to evaluate her performance and prepare her for future openings that may develop on day shift.*" Additionally, Plaintiff passed all of her annual evaluations and had no record of any disciplinary write up before June 16, 2007, after Plaintiff started the Petition activities on June 14, 2007. By Defendant's own admissions, the incident occurred while Plaintiff was on lunch break and involved a matter on which Defendant has no policy. *(Exhibit 15 at 15-19) (Exhibit 16 at 66)* The records also show that Defendant never investigated this incident. *(Exhibit 16 at 65-66)* However Defendant used the incident as a pretext to issue Plaintiff a disciplinary warning for Plaintiff's Petition activities. When Plaintiff gave Mr. Gair a copy of the Petition on or about June 21, 2007, he was already aware of Plaintiff's Petition activities, including that Plaintiff collected some of the signatures during the course of her work.

The issue of Plaintiff remaining in her particular assigned work area, which existed throughout the years of Plaintiff's employment, was never a significant problem for Defendant and never affected

the performance and quality of Plaintiff's work or cause Plaintiff to neglect her work or duties.  In fact Defendant noted that Plaintiff: "*goes the extra mile – help in other areas*", "*assist others when needed*", "*dependable employee, normally gives assistance throughout the facility in all areas*", and required Plaintiff "*as a relief to become very familiar with all the areas on day shift*". *(Exhibit 4) (Exhibit 5)(Exhibit 6) (Exhibit 8)* Even Plaintiff's Petition activities during the course of her work did not so offend Defendant to cause Defendant to take direct drastic action against Plaintiff.

It was only after the Defendant found out that Plaintiff was pushing the race discrimination claims and passing out EEOC forms to her Co-workers that Defendant was motivated to take immediate drastic action against Plaintiff.  Mr. Gair makes clear that the issue of Plaintiff been outside of her work area is a pretext for the real reason that Plaintiff: "*was handing out EEOC petitions and I was concerned about that*", and further: "*It had nothing to do with the petition at this point in time.  She was out of her area.  She had an EEOC form that she was handing out to be filled out and returned to her.*"  *(Exhibit 15 at 16-17)*.  It is clear from the records and reasonable inferences to be drawn there from, that Defendant's explanation that Plaintiff was suspended for going on three weeks because she was out of her assigned work area "is unworthy of credence."   "Employee seeking to prove retaliation by indirect evidence can prove pretext by showing that employer's proffered legitimate, nonretaliatory explanation for challenged action is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation.  *Price v. Thompson,* 380 F. 3d 212 (D.Md 2004).

**e.  Impermissible factors actually motivated Defendant adverse employment**

**decision taken against Plaintiff**

Defendant would not have suspended Plaintiff if Plaintiff was not handing out the EEOC forms and pressing the race discrimination claims for she and her Co-workers. Mr. Gair made it clear that Plaintiff: *"was handing out EEOC petitions and I was concerned about that"*, and further that, *"It had nothing to do with the petition at this point in time. She was out of her area. She had an EEOC form that she was handing out to be filled out and return to her."* Defendant also admitted that Plaintiff was suspended because she was handing out EEOC forms. *(Exhibit 16 at 35-36)*

Furthermore Defendant actions and attitude show that Defendant did not care about any federally protected rights that Plaintiff may have had under the circumstances. Defendant disregarded Plaintiff's May 4, 2007 complaint and did not carry out any serious investigation of Plaintiff's June 28, 2007 suspension. However Defendant came after Plaintiff aggressively, repossessing her vehicle, demanding tuition reimbursement, closing her credit union account, and defeating her unemployment insurance benefit claim. Defendant used its action against Plaintiff to cower and intimidate Plaintiff's Co-workers who were raising the issue of race discrimination as it affected the terms, conditions and benefits of their employment.

**f. Defendant would not have Suspended Plaintiff Indefinitely if Plaintiff was not Handing Out EEOC Forms while She was Out of Her Work Area:**

Based on Plaintiff's performance evaluations, Plaintiff was described as a "good worker" very conscientious" "dependable" and "a team player". *(Exhibit 4) (Exhibit 5)(Exhibit 6) (Exhibit 8)*

Over the years Defendant has used Plaintiff as a floater or relief housekeeper who was required to work in, and know all areas of Defendant facility and assist her Co-workers in all areas. This

presented a challenge for Plaintiff to remain in her specific assigned areas throughout the entire shift. This was known to and accepted by Defendant. Defendant treated the issue as a "developmental goal" for Plaintiff. Furthermore as a relief housekeeping aide, Plaintiff was required, *"to become very familiar with all the areas on day shift"*.

Although Defendant knew that Plaintiff carried out some of the Petition activities during the course of her work, Defendant showed no particular concern. It was only after Plaintiff started to press the race discrimination claims and handing out EEOC forms that Defendant took adverse action against Plaintiff. As Mr. Gair stated, Plaintiff: *"was handing out EEOC petitions and I was concerned about that"*, and further that, *"It had nothing to do with the petition at this point in time.* "Although the employee bears the burden of persuasion in employment discrimination case that discrimination was a motivating factor, the employee need not prove that but for the discrimination she would not have been discharged." *Gasper v. Ruffin Hotel Corp. of Maryland, Inc.,* 960 A.2d 1234 (Md. Spec. App. 2008)

**C.** **Defendant is Not Entitled To Summary Judgment on the Plaintiff's Disparate Treatment Claim (Count III),**

Count III of the Plaintiff Second Amended Complaint avers that because of racial animus the Defendant discriminated against the Plaintiff in the terms, conditions and privileges of her employment by indefinitely suspending Plaintiff's employment for been out of her work area participating in protective activity, while favoring out of area activities unrelated work activities.

**1. The Plaintiff Can Establish By Direct Evidence that Defendant's**

**Discriminatory Treatment of the Plaintiff was Motivated by Racial Animus**

Plaintiff incorporates by reference, and set forth here, Plaintiff points and arguments above in part III (B) (1) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue is the same there as here.

> **2. The Plaintiff Can Prove by Inference that Defendant Discriminatory Treatment of the Plaintiff was Because of Racial Animus.**

"At first step of *McDonnell Douglas* burden-shifting framework, employee has burden to establish prima facie case of discrimination, and Title VII plaintiff using standard formulation for prima facie case meets this burden by showing that (1) she is a member of a protected class, (2) she suffered adverse employment action, (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action, and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Lettieri v. Equant Inc.,* 478 F. 3d 646-7 (Va. 2007) "Precise requirements of a prima facie case under *McDonnell Douglas* standard applicable to employment discrimination actions can vary depending on the context, and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N.A.,* 534 US 512 (US 2002).

> **a. Plaintiff is a Member of a Protected Class**

There is no dispute that Plaintiff is an African American US citizen who is protected under Title VII and Section 1981.

> **b. Plaintiff's Performed Her Job Consistent With the Legitimate Expectation of Defendant:**

Plaintiff incorporate by reference, and set forth here, Plaintiff points and arguments above in part

III (B) (2) (d) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue are the same there as here.

Furthermore, Defendant makes no supported claim that Plaintiff neglected any job duties or responsibilities while Plaintiff carried out the Petition activities or handed out the EEOC forms.

### c. Defendant Took Adverse Actions Against the Plaintiff:

Plaintiff incorporate by reference, and set forth here, Plaintiff points and arguments above in part III (B) (2) (b) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue are the same there as here.

### d. Defendant's June 28, 2007 Suspension of Plaintiff Done Under Circumstances that Infer Discriminatory Motive and Racial Animus:

Mr. Gair stated that Plaintiff: *"was handing out EEOC petitions and I was concerned about that"*, and further: *"It had nothing to do with the petition at this point in time. She was out of her area. She had an EEOC form that she was handing out to be filled out and returned to her." (Exhibit 15 at 16-17)*. Defendant had also admitted in the records of this case that Plaintiff's handing out of the EEOC forms was the motivating reason for Plaintiff's suspension. *(Exhibit 16 at 35-36)*

Furthermore Plaintiff have put forward unrefuted corroborated evidence that Defendant has knowledge of various types of solicitation activities, unrelated to work, and carried out during work involving Defendant employees leaving their assigned work areas. Defendant show favoritism for violation of its solicitation policy involving its employees carrying out these activities outside of assigned work areas during work, and yet singled out Plaintiff's protected activities outside of her assigned work area, but during the course of her work, for disparate treatment because of racial animus.

25

Under the flexible standard requirements of a prima facie case under _McDonnell Douglas_, Defendant's action is disparate treatment because of racial animus against Plaintiff. *Swierkiewicz at* 997-8 (US 2002).

After Plaintiff's suspension on June 28, 2007 Plaintiff's position as a housekeeping aide remained open for nearly three (3) months before Defendant hire someone to fill the position. *(Exhibit 27 Ans. Ingrr. 24 & 25 at 22)*

Court should not grant summary judgment unless the entire record shows right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that adverse party cannot prevail under any circumstances. *Campbell v. Hewitt, Coleman & Associates, Inc.,* 21 F. 3d 55 (4th Cir. 1994). Reasonable inferences could reasonably be drawn from the facts in dispute that would entitle the Plaintiff to the relief he seeks. *Federal Sav. And Loan Inc. Corp. v. Williams,* 599 F. Supp 1196 (D.Md. 1984). The disputed issues of fact create fair doubt and affect the outcome of the case under Title VII and Section 1981 and therefore the duty of this court is to deny Defendant's summary judgment motion and permit Plaintiff case to proceed to trial.

### e. Defendant proffered Legitimate Reason for Plaintiff's June 28, 2007 Suspension is a Pretext for Racial Animus Against Plaintiff

Plaintiff incorporate by reference, and set forth here, Plaintiff points and arguments above in part III (B) (2) (d) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue are the same there as here.

**f. The real Reason for Defendant suspension of Plaintiff was due to racial animus because Plaintiff was pressing discrimination claim and handing out EEOC forms.**

Plaintiff incorporate by reference, and set forth here, Plaintiff points and arguments above in part III (B) (2) (e) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue are the same there as here.

**g. Defendant would not have fired Plaintiff, if Plaintiff was not pressing discrimination claims and handing out EEOC forms**

Plaintiff incorporate by reference, and set forth here, Plaintiff points and arguments above in part III (B) (2) (f) of this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment. The facts, laws and legal issue are the same there as here.

## IV.    CONCLUSION

WHEREFORE based on the points and authorities set forth above, Plaintiff respectfully requests this Court to Deny Defendant's Motion for Summary Judgment and Grant Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment.

Undersigned counsel respectfully, request the Court's indulgence, to offer for thought and reflection to this Court the moral and persuasive authority of His Imperial Majesty Emperor Haile Selassie I the First, the 225th Emperor of Ethiopia and direct descendant from the line of King David, who on November 2, 1930 was crowned King of Kings, Lord of Lords, Conquering Lion of the tribe of Judah, Elect of God and True Light of this World.[7]   In a message to the United Nations on the occasion of its twenty third (23rd)

---

[7]    Monarchs, heads of governments, esteemed representative and high officials from Seventy two Nations, including the USA, attended and paid homage in Addis Ababa on November 2, 1930 at the Coronation of Ras Tafari and his wife Wayzaro Menen as His Imperial Majesty Emperor Haile Selassie I the First and Empress Wayzaro Menen.

anniversary, His Imperial Majesty Emperor Haile Selassie the First told the world that: "Since all men are born free and equal, invested by Almighty God with inalienable human dignity, it is only right and proper that the spirit of human brotherhood should reign supreme among all peoples who inhabit this planet, that differences of race, tribe, language, pigmentation, religion, or sex should not be made instruments of discrimination between man and man, for all men are equal before the law of creation." *(Important Utterances of H.I.M. Emperor Haile Selassie I, Imperial Ethiopian Ministry of Information, Addis Ababa, Ethiopia p. (1972) ).*

Counsel gives thanks for this Court's thoughtful and careful consideration of the entire matter and the inherent role of the Court to help realized the legitimate aspirations of humanity for the rule of law, truths, equal rights and justice.


Respectfully Submitted,


_____/s/_____
George A. Rose, Esq.
Federal Bar No. 26086

Rose Law Firm, LLC
200 E. Lexington St. Suite 800
Baltimore, MD.  21202
Ph.410-727-7555
Fax. 410-727-7585
Email: grose@roselawfirm.net

Attorney for Plaintiff